**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------- x

DOMINIQUE GREEN, *on behalf of herself*
*and others similarly situated*,

                                             Case No. 1:18-cv-00902-LTS-SN

                Plaintiff

                v.

SWEETWORKS CONFECTIONS, LLC,

                      Defendant.

-------------------------------------------------------- x

### PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS

**LEE LITIGATION GROUP, PLLC**
C.K. Lee (CL 4086)
Anne Seelig (AS 3976)
30 East 39th Street, Second Floor
New York, NY 10016
Tel.: 212-465-1188
Fax: 212-465-1181
*Attorneys for Plaintiff and the Class*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES …………………………………………………………..ii

INTRODUCTION ………………………………………………………………………1

ARGUMENT ……………………………………………………………………………2

    I.     THE COURT HAS SUBJECT MATTER JURISDICTION
         OVER THIS ACTION ………………………………………………………3

    II.    PLAINTIFF HAS STANDING TO SEEK INJUNCTIVE RELIEF ………………9

    III.   PLAINTIFF PLAUSIBLY ALLEGES THAT THE PRODUCT
         CONTAINS NON-FUNCTIONAL SLACK-FILL ………………………………11

    IV.   PLAINTIFF PLAUSIBLY ALLEGES MATERIAL DECEPTION………………18

    V.    PLAINTIFF PLAUSIBLY ALLEGES INJURY …………………………………27

    VI.   PLAINTIFF HAS PLAUSIBLY ALLEGED COMMON LAW FRAUD ………..30

SUMMARY AND CONCLUSION …………………………………………………30

# TABLE OF AUTHORITIES

**Cases**

*Ackerman v. Coca-Cola Co.*,
    2013 U.S. Dist. LEXIS 184232, 2013 WL 7044866 (E.D.N.Y. July 17, 2013) ...................... 10

*Ackerman v. Coca-Cola Co.*,
    No. CV-09-0395, 2010 U.S. Dist. LEXIS 73156 (E.D.N.Y. July 21, 2010) ........................... 22

*Anirudh v. CitiMortgage, Inc.*,
    598 F. Supp. 2d 448 (S.D.N.Y. 2009) ................................................................................ 6

*Arista Records Ltd. Liab. Co. v. Doe*,
    604 F.3d 110 (2d Cir. 2010) ................................................................................... 17, 18

*Ashcroft v. Iqbal*,
    129 S. Ct. 1937 (2009) ............................................................................................ 2, 15

*Ava Acupuncture P.C. v. State Farm Mut. Auto. Ins. Co.*,
    592 F. Supp. 2d 522 (S.D.N.Y. 2008) ................................................................................ 8, 9

*Ball v. Hershey Foods Corp.*,
    842 F. Supp. 44 (D. Conn.), aff'd, 14 F.3d 591 (2d Cir. 1993) .................................... 7

*Bautista v. Cytosport, Inc.*,
    No. 15-CV-9081 (CS), 2016 U.S. Dist. LEXIS 171468 (S.D.N.Y. Dec. 12, 2016) ................ 13

*Beacon Constr. Co., Inc. v. Matco Elec. Co.*,
    521 F.2d 392 (2d Cir. 1975) ................................................................................... 8

*Belfiore v. Procter & Gamble Co.*,
    F. Supp. 3d 440 (E.D.N.Y. 2014) ................................................................................ 9

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007) ................................................................................... 2, 15, 17, 18

*Bell v. Herschey Co.*,
    557 F. 3d 953 (8th Cir. 2009) ................................................................................ 9

*Biola Daniel v. Tootsie Roll Indus., LLC*,
    1:17-cv-07541, 2018 WL 3650015 (S.D.N.Y. Aug. 1, 2018) ...................................... 4

*Bratton v. Hershey Co.*,
    No. 2:16-cv-4322, 2017 U.S. Dist. LEXIS 74508 (W.D. Mo. May 16, 2017) ............. 12, 19, 24

*Broglie v. MacKay-Smith*,
    541 F.2d 453 (4th Cir. 1976) ................................................................................ 8

*Colavito v. N.Y. Organ Donor Network, Inc.*,
    438 F.3d 214 (2d Cir. 2006) ................................................................................ 8

*Daniel v. Mondelez*,
   287 F. Supp. 3d 177 (E.D.N.Y. 2018)........................................................................ 25

*Delgado v. Ocwen Loan Servicing Company, LLC*,
   No. 13-CV-4427, 2014 U.S. Dist. LEXIS 135758 (E.D.N.Y. Sept. 23, 2014)................. 10, 20

*DiPonzio v. Bank of Am. Corp.*,
   No. 11-CV-06192, 2011 U.S. Dist. LEXIS 74158 (W.D.N.Y. July 11, 2011) ......................... 7

*Escobar v. Just Born*,
   No. CV 17-01826, 2017 U.S. Dist. LEXIS 186573 (C.D. Cal. June 12, 2017) ................. 13, 24

*F.T.C. v. Cyberspace.com LLC*,
   453 F.3d 1196 (9th Cir. 2006)........................................................................................ 20

*Faltaous v. Johnson and Johnson*,
   2007 WL 3256833 (D.N.J. Nov. 5, 2007)......................................................................... 7

*Famous Horse Inc. v. 5th Ave. Photo Inc.*,
   624 F.3d 106 (2d Cir. 2010) ........................................................................................... 2

*Fermin v. Pfizer*,
   215 F. Supp. 3d 209 (E.D.N.Y. 2016) ............................................................................ 24

*Gant v. Wallingford Bd. of Educ.*,
   69 F.3d 669 (2d Cir. 1995) ............................................................................................. 2

*Giovanniello v. N.Y. Law Publ'g Co.*,
   2007 U.S. Dist. LEXIS 56694, 2007 WL 2244321 (S.D.N.Y. Aug. 6, 2007) ......................... 3

*Goldemberg v. Johnson & Johnson Consumer Cos.*,
   8 F. Supp. 3d 467 (S.D.N.Y. 2014) ............................................................................... 20

*Hanley v. Chicago Title Ins. Co.*,
   No. 12- 4418, 2013 WL 3192174 (S.D.N.Y. June 24, 2013)................................................ 2

*Hendricks v. StarKist Co.*,
   30 F. Supp. 3d 917 (N.D. Cal. 2014) ............................................................................. 19

*Hughes v. Ester C Co.*,
   930 F. Supp. 2d 439 (E.D.N.Y. 2013)........................................................................... 20

*Izquierdo v. Mondelez Int'l, Inc.*,
   No. 16-cv-04697, 2016 U.S. Dist. LEXIS 149795 (S.D.N.Y. Oct. 26, 2016) ........ 14, 18, 22, 27

*Koehler v. Litehouse, Inc.*,
   2012 U.S. Dist. LEXIS 176971, 2012 WL 6217635 (N.D. Cal. Dec. 13, 2012) ..................... 10

*Lazaroff v. Paraco Gas Corp.*,
   967 N.Y.S.2d 867 (Sup. Ct.) ......................................................................................... 28

*Leonhart v. Nature's Path Foods, Inc.*,
   No. 13-cv-00492, 2014 U.S. Dist. LEXIS 164425 (N.D. Cal. Nov. 21, 2014)....................... 19

*Lonner v. Simon Prop. Grp., Inc.*,
866 N.Y.S.2d 239 (App. Div 2008.) ...................................................................... 20

*Makarova v. United States*,
201 F.3d 110 (2d Cir. 2000) ................................................................................... 3

*Martin v. Trott Law, P.C.*,
265 F. Supp. 3d 731 (E.D. Mich. 2017) ................................................................. 6

*Mason v. Lockwood, Andrews & Newnam, P.C.*,
842 F.3d 383 (6th Cir. 2016) .................................................................................. 7

*Morrison v. Nat'l Austl. Bank Ltd.*,
547 F.3d 167 (2d Cir. 2008) ................................................................................... 3

*Pretka v. Kolter City Plaza II, Inc.*,
608 F.3d 744 (11th Cir. 2010) ................................................................................ 9

*Raines v. Byrd*,
521 U.S. 811 (1997) ............................................................................................... 10

*Raskas v. Johnson & Johnson*,
719 F.3d 884 (8th Cir. 2013) .................................................................................. 9

*Samet v. P&G*,
No. 5:12-CV-01891, 2013 U.S. Dist. LEXIS 86432 (N.D. Cal. June 18, 2013) ............... 12, 19

*Stoltz v. Fage Dairy Processing Indus., S.A.*,
No. 14-CV-3826 (MKB), 2015 U.S. Dist. LEXIS 126880 (E.D.N.Y. Sep. 22, 2015) ............ 20

*Thomas v. Costco Wholesale Corp.*,
No. 5:12-CV-02908, 2014 U.S. Dist. LEXIS 46405 (N.D. Cal. Mar. 31, 2014) .................... 19

*United States v. 174 Cases*,
287 F.2d 246 (3d Cir. 1961) ................................................................................... 24

*Waldman v. New Chapter, Inc.*,
714 F. Supp. 2d 398 (E.D.N.Y. 2010) ................................................................... 12

*Watkins Inc. v. McCormick & Co. (In re McCormick & Co.)*,
215 F. Supp. 3d 51 (D.D.C. 2016) .............................................................. 19, 23, 24

*Weisman v. LeLandais*,
532 F.2d 308 (2d Cir. 1976) ................................................................................... 2

*Williams v. Gerber Prods. Co.*,
552 F.3d 934 (9th Cir. 2008) ................................................................................. 20

*Woods v. Maytag Co.*,
807 F. Supp. 2d 112 (E.D.N.Y. 2011) .................................................................... 2

**Statutes**

Cal. Bus. & Prof. Code § 12606.2(e) ....................................................................... 23

iv

NY GBL § 349..................................................................................................................... 13, 20

NY GBL § 350..................................................................................................................... 13

**Rules**

Fed. R. Civ. P. 12(b)(6)........................................................................................................ 1

Fed. R. Civ. P. 12(c) ............................................................................................................ 1

**Regulations**

21 C.F.R. § 100.100(a).......................................................................................................... 11

58 Fed. Reg. 64123, 64128 .................................................................................................. 21

58 Fed. Reg. 64123, 64131 .................................................................................................. 21, 22, 24

**INTRODUCTION**

Plaintiff DOMINIQUE GREEN ("Plaintiff") hereby respectfully submits this Opposition to Defendant SWEETWORKS CONFECTIONS,, LLC's ("Sweetworks" or "Defendant") Motion to for Judgment on the Pleadings as to Plaintiff's First Amended Complaint (herein "Amended Complaint" or "Am. Compl."). On February 1, 2018, Plaintiff brought a Class Action Complaint seeking redress for the unfair, deceptive and otherwise improper business practices according to which Defendant packages its 3.5 theater box of Sixlets candy (herein, "Sixlets" or the "Product"). A First Amended Class Action Complaint was then filed on May 9, 2018 and Defendant's Motion for Judgment on the Pleadings ("Def. Mem."), here opposed by Plaintiff, was filed on September 13, 2018

The Product is packaged in non-transparent boxes. The size of the boxes in relation to the amount of candy actually contained therein makes it appear to consumers that they are buying more food than is actually being sold. By increasing the size of the Product packaging and providing consumers with gratuitous empty space (or "non-functional slack-fill") rather than additional candy, Defendant deceptively induces consumers to make purchases they would not have made at the given prices had they been aware of the discrepancy between the size of the boxes and the amount of food inside. Plaintiff and Class members viewed Defendant's misleading Product packaging, reasonably relied on the representation created by its size and were thereby deceived into purchasing the Product for a price they would not otherwise have been willing to pay. Through these unfair and deceptive practices, Defendant has collected millions of dollars that it would not have otherwise earned. Plaintiff brought this action to stop Defendant's deceptive practices.

Since Fed. R. Civ. P. 12(c) motions "are evaluated using the same standard as a motion to dismiss under Fed. R. Civ. P. 12(b)(6)," *Kinra v. Chicago Bridge & Iron Co*., 17-cv-4251, 2018 WL2371030, at *6 (S.D.N.Y. May 24, 2018), the "issue is not whether a plaintiff is likely to prevail

1

ultimately, 'but whether the claimant is entitled to offer evidence to support the claims. Indeed it may appear on the face of the pleading that a recovery is very remote and unlikely but that is not the test.'" *Gant v. Wallingford Bd. of Educ.*, 69 F.3d 669, 673 (2d Cir. 1995) (quoting *Weisman v. LeLandais*, 532 F.2d 308, 311 (2d Cir. 1976)).  A court "must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor." *Hanley v. Chicago Title Ins. Co.,* No. 12- 4418, 2013 WL 3192174, at *2 (S.D.N.Y. June 24, 2013) (citing *Famous Horse Inc. v. 5th Ave. Photo Inc.,* 624 F.3d 106, 108 (2d Cir. 2010)).  Thus, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and… determine whether they plausibly give rise to an entitlement of relief." *Woods v. Maytag Co.*, 807 F. Supp. 2d 112, 118–19 (E.D.N.Y. 2011) (quoting *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009)).  Plaintiffs need only assert factual allegations sufficient "to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Plaintiffs' claims to relief must be "plausible on its face," *Id*. at 570, and a complaint fails if it merely "tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 557).  However, "[t]he plausibility standard [on a motion to dismiss] is not akin to a probability requirement." *Iqbal*, 129 S. Ct. at 1937.  Plaintiffs need only "nudge" their allegations "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 548.

Defendant's brief (herein "Def. Mem.") argues that the Amended Complaint fails by these standards and that Plaintiff furthermore lacks standing to seek injunctive relief.  However, the clear and unambiguous factual allegations in the Amended Complaint render Plaintiff's claims more than plausible and are patently sufficient to sustain this class action.  Defendant furthermore argues that this Court lacks federal subject matter jurisdiction because Plaintiff cannot meet the minimum jurisdictional requirements under CAFA that the class consist of at least 100 members and that there

exist minimal diversity between at least one class member and the defendant.  As detailed below, this argument is meritless.

## ARGUMENT

### I.    THE COURT HAS SUBJECT MATTER JURISDICTION OVER THIS ACTION

Defendant argues that Plaintiff fails to allege that either of the two Classes proposed in the Amended Complaint includes "100 or more plaintiffs," and that the Court therefore lacks subject matter jurisdiction, because the Amended Complaint "only identifies a *single* Plaintiff: Dominique Green…"  Def. Mem., pg. 7.  This argument is beyond frivolous.  While Defendant's argument is ostensibly directed against the Amended Complaint, it is in fact directed against the very concept of a consumer fraud class action, where named plaintiffs will typically be unable to identify the absent class members at the outset of the litigation.  The question is not whether Plaintiff Green can *identify* absent class members but whether there is reason to believe that at least 100 such people *exist*.

"A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).  However, "[i]n resolving a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) a district court may consider evidence outside the pleadings." *Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (citing *Makarova*, 201 F.3d at 113).  "The mover and the pleader may use affidavits and other materials beyond the pleadings themselves in support of, or in opposition to, a challenge to subject matter jurisdiction." *Giovanniello v. N.Y. Law Publ'g Co.*, 2007 U.S. Dist. LEXIS 56694, 2007 WL 2244321, at *2 (S.D.N.Y. Aug. 6, 2007) (internal citations omitted).

In the instant case, there is ample evidence outside the pleadings to establish the existance of at least 100 class members in either Class, not only by a preponderance of the evidence, but

beyond a reasonable doubt.  For example, Defendant's own press releases tell us that it was the "presenting sponsor" of the 2017 USA Bowling National Championships in both 2017 and 2018. See Declaration of C.K. Lee ("Lee Decl."), **Exhibit A** and **Exhibit B**.  It is exceedingly implausible that the USA Bowling National Championships would have chosen a "presenting sponsor" who proved incapable of selling its product to at least 100 individuals over the course of approximately 44 months (the Class Period since the onset of this litigation).  These press releases also name Joe Annunziato as the "Sixlets Senior Brand Manager."  Lee Decl., **Exhibits A and B**.  Again, it is exceedingly implausible that Defendant could afford to pay the salary of a brand manager specifically responsible for just one product if it could not sell that product to more than 100 people over 44 months.

Since Mr. Annunziato is a "senior" Sixlets brand manager, there is presumably at least one junior Sixlets brand manager, whose salary would only put a further strain on what Defendant suggests are its meager revenues.   One of the press releases notes that Defendant subsidizes the jerseys of teams reaching the national championship and gifts Sixlets to participants at the Junior Gold Championships.  *See* Lee Decl., **Exhibit A**.  Even these modest expenditures would be extremely onerous for a company that cannot sell one of its principal products to more than 100 individuals over 44 months.  Indeed, Defendant's argument suggests that it has given away more candy than it has ever sold.

In short, it is beyond peradventure that there exist at least 100 class members.  Citing *Biola Daniel v. Tootsie Roll Indus.*, LLC, 1:17-cv-07541, 2018 WL 3650015, at *11 (S.D.N.Y. Aug. 1, 2018), Defendant imagines it has caught Plaintiff in the contradiction of alleging that "there are sufficient potential class members to establish jurisdiction under CAFA" while confessing "that the number is 'unknown.'"  Def. Mem., pg. 7.  This argument is most glib, however.  One can be quite

certain that over 300 million people reside in the United States without knowing the precise number, and something analogous holds true of the class membership in the instant action.

In yet another desperate argument, Defendant claims that the class membership is limited to those who purchased the Product only once, because only these individuals would have standing to seek injunctive relief. *See* Def. Mem., pgs. 7-8. Even granting Defendant's argument regarding injunctive relief, Defendant's own statements as documented above indicate beyond a reasonable doubt that at least 100 such individuals exist. Further, classes can be redefined or refined at later stages of the litigation. It may be that only a subset of individuals in a damages class also qualify for membership in an injunctive relief class. Yet the membership of the former would still be relevant for purposes of determining CAFA jurisdiction. At any rate, the Classes as they stand are defined as those having made retail purchases of the Product, not those entitled to a particular form of relief under applicable law. Defendant does not cite a single case wherein the latter was held to have any bearing on questions of subject-matter jurisdiction.

Not satisfied with the absurd suggestion that the class membership may not amount to 100 individuals, Defendant next tenders another unconvincing argument that not one of these individuals is a non-New York citizen: "Plaintiff also concedes that there is no minimal diversity because Plaintiff is a New York citizen, SweetWorks's principal place of business is New York…" Def. Mem., pg. 8. However, Defendant's own press releases also eliminate all doubt that a significant percentage of the membership of the Nationwide Class consists in non-New York citizens. Defendant acknowledges therein that Sixlets is "available at retailers across the U.S." and quotes IBC Youth Managing Director Gary Brown describing Sixlets as a "nationally recognized brand." Lee Decl., **Exhibit A**. Sixlets' nationwide prominence is also attested to by the fact that "[t]he Sixlets Brand partnership will extend to the 16 regional events," which includes locations spanning from California

to Rhode Island. *See* Lee Decl., **Exhibit B**. A company that had no sales outside of New York would not be motivated to engage in such a farflung partnership.

Sensing the weakness of its argument that Plaintiff fails to establish CAFA jurisdiction, Defendant next proceeds to argue that one of the three CAFA exceptions to federal subject-matter jurisdiction would require the Court to decline such jurisdiction. See Def. Mem., pg. 9-10. But while Defendant successfully enumerates the various elements of the "local controversy," "home state controversy," and "interests of justice" exceptions, it offers no actual evidence that they apply to the instant action. Although Plaintiff bears the burden of proving subject matter jurisdiction under CAFA, it is Defendant that "bears the burden of proving that an exception to CAFA applies." *Anirudh v. CitiMortgage, Inc.*, 598 F. Supp. 2d 448, 451 (S.D.N.Y. 2009). And Defendant resoundingly fails to meet this burden.

Corporate defendants who have successfully invoked one of the CAFA jurisdictional exceptions apply have done so by submitting actual evidence about their customer base. *See id.* ("To support these contentions, defendant submits… an affidavit by… defendant's Operations Support Manager… stating that he determined, by querying defendant's computerized records, that between March 26, 2002 and December 31, 2007 there were 14,998 CMI co-op loans that were paid off nationwide, of which 96.7% were New York co-op loans…"). But Sweetworks offers nothing of the kind and instead resorts to sheer casuistry, arguing that the exceptions are proven as a logical matter by Plaintiff's inability to establish minimal diversity. *See* Def. Mem., pg. 10. But this argument has already been disposed of above. And a party seeking relief under a CAFA jurisdictional exception cannot obtain it by pointing to putative deficiencies in the other party's evidence. *See Martin v. Trott Law, P.C.*, 265 F. Supp. 3d 731, 744 (E.D. Mich. 2017) ("Trott's argument that the home state exception applies is based on deposition testimony of the named plaintiffs expressing ignorance of the number of letter recipients who have moved out of the state,

6

and published census data that tracks migration of the general population in and out of various states. That evidence is hardly compelling. The party seeking relief under one of the enumerated exceptions in section 1332(d)(4) 'bears the burden of establishing each element of the exception by a preponderance of the evidence.'") (quoting *Mason v. Lockwood, Andrews & Newnam, P.C.*, 842 F.3d 383, 388 (6th Cir. 2016)).

While Ms. Stout declares that "Sixlets theater box sales in New York are substantially less that $5 million," Declaration of Rebecca Stout ("Stout Decl.") ¶ 16, Defendant's does not seem to challenge whether Plaintiff has adequately pled CARA's jurisdictional amount-in-controversy requirement.  Nevertheless, Plaintiff here addresses it in order to put the question to rest.  In the first place, Plaintiff notes that she will be able to satisfy this requirement so long as Defendant has sold at least 10,000 units *just in New York* over the 3-year statutory period under NY GBL § 350, since the latter provides for $500 in statutory damages for each violation.  See *DiPonzio v. Bank of Am. Corp.*, No. 11-CV-06192, 2011 U.S. Dist. LEXIS 74158, at *11 (W.D.N.Y. July 11, 2011) ("In *Shady Grove*, the total statutory damages for all class members in the federal suit exceeded five million dollars, thus the amount in controversy met the requirement for federal diversity jurisdiction.").  Once potential attorneys' fees are figured into the amount in controversy, the threshold sales required is even lower.  *See Ball v. Hershey Foods Corp.*, 842 F. Supp. 44, 47 (D. Conn.), aff'd, 14 F.3d 591 (2d Cir. 1993) (holding that a court may take into account attorney's fees when calculating the amount in controversy).

The amount-in-controversy is raised further when we consider damages accruing during the pendency of this litigation.  *See Faltaous v. Johnson and Johnson*, 2007 WL 3256833, at *9 (D.N.J. Nov. 5, 2007) ("[w]hile the amount in controversy is determined through consideration of the good faith allegations of the complaint at the time it was filed…, damages accruing in the future are

properly counted against the jurisdictional amount"). This is not unique to CAFA but also a longstanding principle of traditional diversity jurisdiction. *See Broglie v. MacKay-Smith*, 541 F.2d 453, 455 (4th Cir. 1976) ("plaintiffs here may rely upon costs to be incurred subsequent to the filing of the complaint but prior to trial in meeting the jurisdictional amount requirement").

The amount-in-controversy is also raised by the value of the injunctive relief sought by Plaintiff on behalf of the Class, which may also be considered in evaluating whether the necessary threshold has been met. *See Ava Acupuncture P.C. v. State Farm Mut. Auto. Ins. Co*, 592 F. Supp. 2d 522, 527 (S.D.N.Y. 2008) ("Where non-monetary relief is sought, 'the amount in controversy is measured by the value of the object of the litigation.' In traditional class action suits in federal court under diversity jurisdiction, the object of the litigation has been viewed as 'the monetary value of the benefit that would flow to the plaintiff if injunctive or declaratory relief were granted'") (citations omitted); *Beacon Constr. Co., Inc. v. Matco Elec. Co*., 521 F.2d 392, 399 (2d Cir. 1975) (the amount in controversy "is not necessarily the money judgment sought or recovered, but rather the value of the consequences which may result from the litigation").

Defendant may retort that much of this is speculative. But such "speculation" has been expressly endorsed by many courts for purposes of determining CAFA jurisdiction. There is "a rebuttable presumption that the face of the complaint is a good faith representation of the actual amount in controversy." *Colavito v. N.Y. Organ Donor Network, Inc*., 438 F.3d 214, 221 (2d Cir. 2006). And rebutting this presumption requires a defendant to "show that the complaint was so patently deficient as to reflect to a legal certainty that the plaintiff could not recover the amount alleged or that the damages alleged were feigned to satisfy jurisdictional minimums." *Id.* Defendant's argument falls obviously short of this high standard.

The actual, empirical likelihood of recovering the jurisdictional minimum is legally irrelevant. *See Zacharia v. Harbor Island Spa, Inc*, 684 F.2d 199, 202 (2d Cir. 1982) ("The jurisdictional determination is to be made on the basis of the plaintiff's allegations, not on a decision on the merits. Moreover, even where those allegations leave grave doubt about the likelihood of a recovery of the requisite amount, dismissal is not warranted.").  While *Zacharia* was addressing traditional diversity jurisdiction, its principles have been applied to CAFA. *See Ava Acupuncture P.C.*, 592 F. Supp. 2d at 530 n.61 (S.D.N.Y. 2008) ("Although *Zacharia* concerned whether the amount in controversy was satisfied for diversity jurisdiction purposes, the same principles apply here" and "[t]hat plaintiffs may ultimately obtain much less than the amount in controversy is inconsequential").

This is consistent with the judgments of courts in other circuits. "[W]hen determining the amount in controversy, the question 'is not whether the damages are greater than the requisite amount, but whether a fact finder might legally conclude that they are.'" *Raskas v. Johnson & Johnson*, 719 F.3d 884, 887 (8th Cir. 2013) (quoting *Bell v. Herschey Co*., 557 F. 3d 953, 959 (8th Cir. 2009) (further citations omitted).  *See also Pretka v. Kolter City Plaza II, Inc*., 608 F.3d 744, 754 (11th Cir. 2010) ("The point is that a removing defendant is not required to prove the amount in controversy beyond all doubt or to banish all uncertainty about it.").

## II.   PLAINTIFF HAS STANDING TO SEEK INJUNCTIVE RELIEF

Defendant argues that Plaintiff lacks standing to pursue injunctive relief because there is no indication that she intends to purchase any of the Products again, and is therefore unlikely to suffer any future injury.  *See* Def. Mem., pgs. 10-13.  However, this argument ignores that "an injunction in connection with a class action is designed to afford protection of future consumers from the same fraud. It does this by permitting the plaintiff to sue on their behalf." *Belfiore v. Procter & Gamble*

9

*Co.*, F. Supp. 3d 440, 445 (E.D.N.Y. 2014).  To hold otherwise "denigrate[s] the New York consumer protection statute, designed as a major support of consumers who claim to have been cheated." *Id.  See Delgado v. Ocwen Loan Servicing Company, LLC*, No. 13-CV-4427, 2014 U.S. Dist. LEXIS 135758, at *42 (E.D.N.Y. Sept. 23, 2014) ("Finding that Plaintiffs have no federal standing to enjoin a deceptive practice once they become aware of the scheme would eviscerate the intent of the California legislature in creating consumer protection statutes.") (internal quotation marks and citation omitted); *Ackerman v. Coca-Cola Co.*, 2013 U.S. Dist. LEXIS 184232, 2013 WL 7044866, at *56 n.23 (E.D.N.Y. July 17, 2013) ("[C]ourts have consistently held that plaintiffs have standing to seek injunctive relief based on the allegation that a product's labeling or marketing is misleading to a reasonable consumer.  To hold otherwise would 'effectively bar any consumer who avoids the offending product from seeking injunctive relief.'") (quoting *Koehler v. Litehouse, Inc.*, 2012 U.S. Dist. LEXIS 176971, 2012 WL 6217635, at *6 (N.D. Cal. Dec. 13, 2012)).

Some have argued that the policy considerations behind state consumer protection laws must yield to the Constitution.  But there is no conflict between the two.  The Supreme Court has held that "[t]he standing inquiry focuses on whether the plaintiff is the proper party to bring this suit." *Raines v. Byrd*, 521 U.S. 811, 818 (1997).  This formulation thus presupposes that the proper party *exists*: The reference is to *the* proper party, whomever that happens to be, not to *a* proper party, who might or might not exist.  And this is consistent with the reasoning of courts that have held injunctive relief to be appropriate in consumer fraud class actions: Given the specific conundrum intrinsic to these cases—that anyone who becomes aware of the deception and so is positioned to bring a complaint is unlikely to be duped again—the usual application of the standing rule must be adjusted accordingly if there is ever to be a proper party, which the *Raines* formulation indicates there must be.  In these cases, the proper party to request injunctive relief is the party that

already has standing to request other forms of relief arising out of the same case or controversy. This is the *best conceivable* party given the very nature of the cause of action and the public interest. Article III does not require more than this. The alternative is a state of affairs in which those who need and are entitled to injunctive relief are epistemologically unable to act on that right while those who have the knowledge to do so are for this very reason legally disqualified from doing so.

## III.   PLAINTIFF PLAUSIBLY ALLEGES THAT THE PRODUCT CONTAINS NON-FUNCTIONAL SLACK-FILL

Defendant suggests to the Court that the slack-fill in the Product might be defensible on the basis of one or more of the "safe harbors" enumerated in 21 C.F.R. § 100.100(a). These include (1) the need to protect the contents of the package (2) the requirements of the machines that enclose the contents, (3) unavoidable product settling during shipping and handling, (4) the need for the product to perform a specific function that is inherent to the nature of the food, (5) the use of reusable package with a value independent of the food being stored, and (6) inability to increase fill level or further reduce package size. *See* Def. Mem., pgs. 17-18.

But these theoretical possibilities all beg the question of why patently *factual* issues pertaining to the ultimate merits of the case are being debated on a motion to dismiss. Defendant wishes to distract the Court's attention from the state of the *law*, according to which Plaintiff has adequately pled her claims. Refusing to dismiss plaintiff's slack-fill claims, the court in *Waldman v. New Chapter, Inc.* held:

> Specifically, the Complaint alleges that Berry Green's packaging contained empty space or slack fill. Compl. PP 1, 2, 4, 6, 16, 17. Slack fill is "misleading" if it is: (1) "nonfunctional" (i.e., not for a valid purpose); and (2) the container "does not allow the consumer to fully view its contents." 21 C.F.R. § 100.100(a). Drawing reasonable inferences in Plaintiff's favor, the Complaint pleads both of these prongs. Specifically, the Complaint alleges that Defendant included the slack fill "to mislead the consumer," and that the packaging "is geared to making the customer believe that he/she is buying more of the product." Compl. PP 17, 19. Misleading consumers is not a valid reason to package a product with slack fill. See 21 C.F.R. § 100.100(a)(1-6). And, unquestionably, Berry Green's packaging "does not allow the consumer to fully view its contents." Pl. Ex. 2. It follows then that Plaintiff has pled misleading representations sufficient to state an unjust enrichment claim predicated on a slack fill theory.

*Waldman v. New Chapter, Inc.,* 714 F. Supp. 2d 398, 404-05 (E.D.N.Y. 2010).

      *Waldman* was explaining the law with reference to the plaintiff's unjust enrichment claims. But its analysis is equally applicable to all of Plaintiff's causes of action so far as the non-functionality of Defendant's slack-fill is concerned.   The Amended Complaint is at least as well pled as the complaint in *Waldman*, which was not required to preemptively refute every conceivable rationalization the defendant might proffer for the slack-fill in its packaging.  *See Samet v. P&G*, No. 5:12-CV-01891, 2013 U.S. Dist. LEXIS 86432, at *23 (N.D. Cal. June 18, 2013) ("the complaint expressly references the regulation governing slack-fill, including the functional exceptions to the rule, and states that Defendants had 'no lawful justification' for using slack-fill. Drawing all inferences in favor of Plaintiffs, as required for purposes of a motion to dismiss, the court finds Plaintiffs have alleged that Defendants violated the FDA regulation governing slack-fill").

      Defendant charges that "Plaintiff offers no plausible allegations showing that any slack-fill [in the Product] is nonfunctional."  Def. Mem., pg. 17.  But courts have recognized that that large quantities of slack-fill in and of themselves support an inference of non-functionality. *See Bratton v. Hershey Co.*, No. 2:16-cv-4322, 2017 U.S. Dist. LEXIS 74508, at *13-14 (W.D. Mo. May 16, 2017) ("Hershey's statement that 'some' empty space in the boxes is related to 'efficient manufacturing and distribution' is at odds with Bratton's allegation that the slack-filled space in the boxes takes up as much as 29% and 41% of the boxes' space, that the slack-filled space serves no purpose and is not related to the settling of the contents, and that nothing about the manufacturing process prevents Hershey from filling the boxes fuller. To the extent that Hershey disputes these allegations, such dispute cannot be resolved on a motion to dismiss.").

      Beyond this, Plaintiff's allegation of non-functional slack-fill is supported by comparisons with Hershey's 5.0 oz Milk Duds, which has similar dimensions to the Product container but contains only 23% slack-fill—by comparison with the 60% in the Product.  *See* Am. Compl. ¶¶ 33-

34. New York courts have expressly endorsed this method, recognizing that a plaintiff plausibly alleges a slack-fill claim under NY GBL § 349 or NY GBL § 350 when "comparisons to similar products can be made." *Bautista v. Cytosport, Inc*., No. 15-CV-9081, 2016 U.S. Dist. LEXIS 171468, at *13 (S.D.N.Y. Dec. 12, 2016). The method is also endorsed by European Union policymakers,[1] as well as by simple common sense. *See Escobar v. Just Born*, No. CV 17-01826, 2017 U.S. Dist. LEXIS 186573, at *36 (C.D. Cal. June 12, 2017) ("Plaintiff also juxtaposes Defendant's Products against Boston Baked Beans packaging [to] provide a *factual* counterexample to Defendant's claim that any one of the above functionality factors applies… Based upon the foregoing allegations, the Court finds that Plaintiff has adequately alleged that the Products' slack-fill, comprising 35.7% of the Products' box, is nonfunctional.").

Defendant offers various reasons for why the comparison is unfair, arguing that "Milk Duds are nothing like Sixlets and have different packaging requirements altogether." Def. Mem., pg. 15. None of Defendant's objections hold up under scrutiny, however. Defendant notes that what whereas "Sixlets are nearly all identical to the naked eye… no two Milk Duds are alike," from which Defendant asks the Court to infer that the Product is more vulnerable to chipping and therefore requires more slack-fill. Def. Mem., pg. 15. But the very opposite is rather more likely, since Milk Duds could then be expected to have more random protrusions vulnerable to being chipped off. Defendant claims that Sixlets' "smooth, shiny and fragile exterior" requires additional protection not needed by Milk Duds. But Defendant offers no real reason to believe this is the case. It notes that whereas one of these products is filled with caramel, the other is filled with mint. Def. Mem., pg. 15. But these candies' filling can have no influence on their *exteriors*, which is what

---

[1] "For the purpose of this study misleading packaging is defined as any kind of product packaging that notwithstanding a cursory examination as a result of the size of the packaging, its form or design or other important elements directly related to the packaging, including as well **comparisons** of the product in its current state to previous packaging and **to competitors' packaging**, deceives or is likely to deceive the average consumer …" IMCO (2012). Internal Market and Consumer Protection: Misleading Packaging Practices, Directorate- General for Internal Policies, European Parliament: Policy Department A: Scientific and Economic Policy (emphasis added).

might be exposed to chipping.  Ms. Stout declares that the Product "has a shiny, fragile color-coating prone to chipping." Stout. Decl. ¶ 10.  But Ms. Stout is Defendant's Chief Financial Officer, Stout Decl. ¶ 1, not a food scientist, so she has no special competence to opine about the relative fragility of Sixlets as compared to other candies.

Defendant rightly observes that Sixlets and Milk Duds are manufactured by different corporations.  But the fact that the two brands are owned by different entities has no logical bearing on whether it is technologically feasible to include more candy in the Product.  Defendant also states that "the proportions and volumes of the comparator boxes are different." Def. Mem., pg. 15.  But while the proportions are not strictly identical, they are fairly similar: 6.625" x 3.25" x 1.00" (Sixlets) v. 6.125" x 2.625 x 0.9375" (Milk Duds). *See* Am Compl. ¶¶ 1, 33.  These small differences in dimensions do not vitiate Plaintiff's comparison.  The *Bautista* court required "comparisons to similar products," <u>not</u> comparisons to "identical" products—Defendant's proposed standard.  Defendant cites *Izquierdo v. Mondelez Int'l, Inc.* for the proposition that "[c]omparing the Candy to Hot Tamales and Junior Mints is the saccharine equivalent of comparing apples with oranges." *Izquierdo v. Mondelez Int'l, Inc.*, No. 16-cv-04697, 2016 U.S. Dist. LEXIS 149795, at *18 (S.D.N.Y. Oct. 26, 2016).   But Defendant has willfully lifted this statement out of context, as it forms part of the *Izquierdo* court's discussion of *injury*, not the functionality of slack-fill.

Defendant argues that Plaintiff's use of comparator products is inconsistent with the FDA's observation that there may be a high degree of variability in the level of functional slack-fill required within commodity classes.  *See* Def. Mem., pg. 18-19.   However, the FDA was not here promulgating the pleading standards that need be met in order to survive a motion to dismiss.  Rather, it was explaining why it was unprepared to issue any blanket rules specifying the maximum allowable slack-fill in any given product line.  And Plaintiff is not claiming anything to the contrary.  She does not argue that any slack-fill in all candies beyond the 23% found in Milk Duds is *ipso*

*facto* non-functional as a matter of law.  She does not argue that Milk Duds would serve as irrebuttable proof of non-functional of slack-fill in the Product at trial.  Rather, she argues that the comparison provides the "further factual enhancement" required to survive a motion to dismiss. *Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 557), raising Plaintiffs' "right to relief above the speculative level," *Twombly*, 550 U.S. at 555, by "nudg[ing]" her allegations of non-functionality "across the line from conceivable to plausible." *Id.* at 548.  Plaintiff has plainly met that bar.

Defendant's attack on Plaintiff's comparison of the Product with "Smaller Sixlets" is just as flawed as its discussion of Milk Duds.  Smaller Sixlets (dubbed "Discontinued Sixlets" by Defendant) is another 3.5 oz Sixlets product.  The only difference with the Product is that the container is approximately half the size of the Product container, with the result that it harbors only 11% slack-fill (as opposed to the 60% in the Product). *See* Am. Compl. ¶ 29-32.  As argued in the Amended Complaint, this establishes that a significant portion of the slack-fill in the Product is non-functional, because the Smaller Sixlets proves that far less space is required to accommodate 3.5 oz of Sixlets.  Since the candy in the Product and in Smaller Sixlets is identical, Defendant cannot argue that the composition of the Product calls for more functional slack-fill—as it does with respect to Milk Duds.  In a desperate attempt to explain away this smoking gun, Defendant argues that Smaller Sixlets is not an accurate gauge of the functional slack-fill required by 3.5 oz of Sixlets because it was discontinued in response to consumer complaints about chipping.  Defendant's claim is unconvincing on multiple levels, however.

In the first place, it must be noted that Defendant willfully mischaracterizes Plaintiff when it states that "Plaintiff also concedes that the slack-fill in both of the [Sixlets] boxes 'may have functional justification.'" Def. Mem., pg. 4 (quoting Am. Compl. ¶¶ 29, 32).  As the Amended Complaint makes perfectly clear, while Plaintiff concedes that *some* of the slack-fill in the Product

*may* have functional justifications, she straightforwardly alleges that, at a *minimum*, any slack-fill in the Product beyond that found in Smaller Sixlets is non-functional: "The Smaller Sixlets has 11% slack-fill.  The slack-fill in the Smaller Sixlets box may or may not all be functional, but a box of Sixlets candy needs no more than 11% slack-fill.  Slack-fill in excess of 11% in the Product is **certainly** non-functional, as the comparable Smaller Sixlets box demonstrates."  Am. Compl. ¶ 32. Defendant also complains that "Plaintiff does not allege anywhere the degree of functional or non-functional slack-fill in either box."  Def. Mem., pg. 4.  But Defendant does not cite any authorities to support the idea that Plaintiff must plead with degree of non-functional slack-fill with this degree of particularity.

Defendant accuses that "Plaintiff photographs the Discontinued Box and the Current Box side-by-side, hoping to support the allegation that both of the boxes were sold side-by-side in December 2017 when Plaintiff purchased the Current Box."  Def. Mem., pg. 14.  But this is a red herring.  Plaintiff is indifferent to whether the boxes were sold side-by-side in December 2017, as this has no bearing on the amount of functional slack-fill required to accommodate 3.5 oz. of Sixlets.

Defendant's argument that Smaller Sixlets is not a reliable measure of the functional slack-fill required by the Product is unpersuasive.  Ms. Stout declares that Defendant discontinued Smaller Sixlets in 2016 "[d]ue in part to feedback from customers."  Stout Decl. ¶ 8.  But this is an exceedingly vague explanation.  Ms. Stout does not disclose how many complaints Defendant received about product chipping specifically and over what time period.  Complaints of this nature may simply be par for the course with any candy products.  Ms. Stout does not state that Defendant began receiving *fewer* complaints once it enlarged the box.  As Defendant's 2011 catalogue confirms, Defendant was selling Smaller Sixlets <u>at least</u> as far back as 2011—that is, for <u>at least</u> <u>five years</u> before its discontinuance in 2016.  *See* Lee Decl., **Exhibit C**.  So clearly, the chipping could not have been so egregious if it took so long to motivate the decision to enlarge the box.  Even

16

if we credit Ms. Stout's assertion that adding the clear bag was necessary to safeguard the contents, she only states that the bag could not fit into the Smaller Sixlets box but could fit into the Product box. *See* Stout Decl. ¶ 13.  She does not explain how Defendant determined that it needed to *nearly double* the size of the box to accommodate the bag, which is highly counterintuitive.  At any rate, one of Defendant's own brochures discloses that Defendant at some point sold <u>4.0 oz</u> of candy in the <u>Smaller</u> Sixlets box, belying is defense that no more than 3.5 oz. could comfortably fit into either it or the Product box.  That this packaging is indeed that of Smaller Sixlets is confirmed by a blow up of the packaging extracted from a Wayback Machine search.  *See* Lee Decl., **Exhibit D**. Thus, Defendant's argument boils down to the absurd proposition that while it could fit 4.0 oz. in the smaller box, it cannot fit anything over 3.5 oz. into the larger one.

For all these reasons, Plaintiff's allegations more than suffice to establish that much of the slack-fill in the Product is non-functional.  To the extent Defendant suggests that Plaintiff must rule out each of the six FDA safe harbors individually, *see* Def. Mem., pgs. 17-19, this is inconsistent with the pleadings requirements necessary to survive a motion to dismiss.  "The *Twombly* Court stated that '[a]sking for plausible grounds to infer an agreement <u>does not impose a probability requirement</u> at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal[ity].'" *Arista Records Ltd. Liab. Co. v. Doe*, 604 F.3d 110, 120 (2d Cir. 2010) (quoting *Twombly*, 550 U.S. at 556) (emphasis added).  Plaintiffs' comparison products are sufficient to raise this reasonable expectation.

Further, the Second Circuit has unequivocally rejected the evidentiary standard that Defendant implicitly asks the Court to impose: "The *Twombly* plausibility standard, which applies to all civil actions, *see Iqbal*, 129 S. Ct. at 1953, does not prevent a plaintiff from 'pleading facts alleged upon information and belief' where the facts are peculiarly with the possession and control of defendant." *Arista Records Ltd*, 604 F.3d at 120.  Defendant argues that "Plaintiff's burden is to

plausibly allege in a non-conclusory fashion how the slack-fill in the Current Box fails to meet *each* of the functional slack-fill exceptions." Def. Mem., pg. 19. But *Twombly* does not "require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. The precise capabilities of Defendant's machines, for example, is clearly subject matter for discovery and hence irrelevant at this early stage of the litigation. Defendant understands perfectly well that Plaintiff cannot access its premises and that it is therefore impossible for her to proffer the information which it insists is necessary to survive its motion to dismiss.

## IV.   PLAINTIFF PLAUSIBLY ALLEGES MATERIAL DECEPTION

The crux of Defendant's argument that reasonable consumers could not have been misled by its packaging is that it accurately discloses the net weight of the Product. *See* Def. Mem., pg. 20. Defendant argues that Plaintiff's claim presupposes "that consumers will ignore the evidence of the contents before them." Def. Mem, pg. 21. But while Defendant manages to cite a few slack-fill decisions that attached significance to net weight or quantity disclosures, this is hardly the universal consensus. One court in the Second Circuit observed that defendant "does not cite a single controlling decision of law standing for the proposition that food packaging is incapable of being materially misleading if it displays the net weight and lists the number of pieces inside of the package. This Court is unwilling to manufacture such a precedent here." *Izquierdo*, 2016 U.S. Dist. LEXIS 149795, at *16.

This position is shared by courts across the country, which have not seized on net weight/product count disclosures as grounds to dismiss unlawful slack-fill claims. See *Bratton*, 2017 U.S. Dist. LEXIS 74508, at *11 ("the existence of the Federal prohibition against slack-fill supports the reasonableness of a consumer's belief that the package of candy he purchases will not have 29% or 41% non-functional slack-fill."); *Samet*, 2013 U.S. Dist. LEXIS 86432, at *30-

18

33 ("the amount of slack-fill expected by the reasonable consumer is a debatable factual question that is inappropriate to resolve at the motion to dismiss stage"); *Thomas v. Costco Wholesale Corp.*, No. 5:12-CV-02908, 2014 U.S. Dist. LEXIS 46405, at *28 (N.D. Cal. Mar. 31, 2014) ("The Court finds that [the]… slack-fill claims are properly pled, may deceive a reasonable consumer, and are inappropriate to resolve at the motion to dismiss stage."); *Hendricks v. StarKist Co.*, 30 F. Supp. 3d 917, 932 (N.D. Cal. 2014) ("The appearance of the can itself, not its label, is what Plaintiff alleges to be misleading… While StarKist argues that it is 'simply not plausible' that Plaintiff was deceived, the Court cannot agree that these claims lack plausibility on their face."); *Leonhart v. Nature's Path Foods, Inc.*, No. 13-cv-00492, 2014 U.S. Dist. LEXIS 164425, at *20 (N.D. Cal. Nov. 21, 2014) ("The SAC alleges that 'Defendant has routinely employed slack filled packaging containing non-functional slack fill to mislead consumers into believing they were receiving more than they actually were.'… The SAC also alleges that Plaintiff purchased slack filled packages of EnviroKidz Panda Puffs and Heritage Flakes, and that she would not have done so had she realized that the packages were slack filled… Those allegations are sufficient to state a claim."); *Watkins Inc. v. McCormick & Co. (In re McCormick & Co.)*, 215 F. Supp. 3d 51, 60 (D.D.C. 2016) ("The size of a package signals to the consumer vital information about a product and is as influential in affecting a customer's choices as an explicit message on its surface.").

Courts evaluating NY GBL §§ 349, 350 and other consumer fraud claims routinely find that the actual real-world impact of disclaimers on consumers is a complicated question of fact that cannot be resolved on a motion to dismiss.  *See Ackerman v. Coca-Cola Co.*, No. CV-09-0395, 2010 U.S. Dist. LEXIS 73156, at *62-63 (E.D.N.Y. July 21, 2010) ("[T]he presence of a nutritional panel, though relevant, does not as a matter of law extinguish the possibility that reasonable consumers could be misled by vitaminwater's labeling and marketing."); *Stoltz v. Fage Dairy Processing Indus., S.A.*, No. 14-CV-3826, 2015 U.S. Dist. LEXIS 126880, at *49 (E.D.N.Y. Sep.

22, 2015) ("the mere inclusion of an accurate disclaimer does not necessarily cure other potentially misleading statements or representations set forth in a label or advertisement"); *Delgado v. Ocwen Loan Servicing,*, 2014 U.S. Dist. LEXIS 135758, at \*24 ("[a] solicitation may be likely to mislead by virtue of the net impression it creates even though the solicitation also contains truthful disclosures") (quoting *F.T.C. v. Cyberspace.com LLC*, 453 F.3d 1196, 1200 (9th Cir. 2006)); *Hughes v. Ester C Co.*, 930 F. Supp. 2d 439, 464 (E.D.N.Y. 2013) (a disclaimer stating the product is not intended to treat any disease does not eliminate "the possibility of a reasonable consumer being misled"); *Lonner v. Simon Prop. Grp., Inc.*, 866 N.Y.S.2d 239, 247 (App. Div 2008.) (the complaint stated a cause of action under NY GBL § 349 because "it alleges that the inadequate font size in which the dormancy fee provision was printed, and the defendant's concomitant failure to conspicuously disclose that provision, constituted a deceptive business practice."); *Goldemberg v. Johnson & Johnson Consumer Cos.*, 8 F. Supp. 3d 467, 479 (S.D.N.Y. 2014) (rejecting defendant's argument that "it is unreasonable to assume each Aveeno product contains exclusively natural ingredients when its labeling affirmatively identifies its one or two natural ingredients as well as the synthetic ingredients"); *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 939 (9th Cir. 2008) ("We disagree with the district court that reasonable consumers should be expected to look beyond misleading representations on the front of the box to discover the truth from the ingredient list in small print on the side of the box.").

Defendant seizes on Plaintiff's observation in the original Complaint that "consumers have come to expect significant slack-fill in boxed candy." Def. Mem., pg. 21 (quoting Complaint ¶ 52). But while reasonable consumers may expect some degree of slack-fill in certain kinds of food, they do not expect non-functional slack-fill, which is what Plaintiff alleges and what the comparison candies corroborate. Reasonable consumers may not expect candy to be filled to the very top of the box, but they do expect that the size of the packaging will reflect the amount of food inside.

That is, they expect <u>functional</u> slack-fill. Even if consumers have also been led to expect non-functional slack-fill, this does not help Defendant: "FDA also notes that, although consumers may become used to the presence of nonfunctional slack-fill in a particular product or product line, the <u>recurrence of slack-fill over an extended period of time does not legitimize such slack-fill if it is nonfunctional</u>." 58 Fed. Reg. 64123, 64131 (emphasis added). To hold that consumers' general encounters with non-functional slack-fill immunizes Defendant would be to reward bad actors with the perverse incentive to deceive consumers in the hopes of normalizing their deceptive practices.

Defendant cites a few slack-fill cases in a footnote where the court held against the plaintiff. See Def. Mem., pg. 20 n.8. However, it bears emphasis that a number of these were non-food cases that did not implicate the FDA's food-specific slack-fill regulations. The Amended Complaint cites numerous statements by the FDA, often discussing <u>congressional intent</u>, to the effect that accurate net weight/quantity disclosures on the label of a food product do not absolve a manufacturer of liability for non-functional slack-fill. *See* Am. Compl. ¶ 50 ("FDA disagrees with the comments that stated that net weight statements protect against misleading fill. FDA finds that the presence of an accurate net weight statement does not eliminate the misbranding that occurs when a container is made, formed, or filled so as to be misleading.") (quoting 58 Fed. Reg. 64123, 64128); Am. Compl. ¶ 50 ("Congress stated… in arriving at section 403(d) of the act that that section is 'intended to reach deceptive methods of filling where the package is only partly filled and, despite the declaration of quantity of contents on the label, creates the impression that it contains more food than it does.'" (quoting 58 Fed. Reg.  64123, 64128-64129): Am. Compl. ¶ 51 ("Congress stated… that 'Packages only partly filled create a false impression as to the quantity of food which they contain despite the declaration of quantity of contents on the label.'") (quoting 58 Fed. Reg. 64123, 64131).

These regulations have been incorporated into the New York laws applied by New York courts.  *See Ackerman v. Coca-Cola Co*., No. CV-09-0395, 2010 U.S. Dist. LEXIS 73156, at *13 (E.D.N.Y. July 21, 2010) ("New York's Agriculture and Marketing law similarly provides in relevant part that food shall be deemed misbranded '[i]f its labeling is false or misleading in any particular,' and incorporates the FDCA's labeling provisions"); *Izquierdo*, 2016 U.S. Dist. LEXIS 149795, at *11 ("Here [in a slack-fill action brought under NY GBL § 349], New York law expressly incorporates the standard imposed by the FDCA").   Indeed, the *Izquierdo* court recognized that to hold that accurate weight/quantity disclosures defeat deceptive slack-fill claims as a matter of law would essentially nullify federal slack-fill regulations, which were promulgated as <u>additional</u> protections beyond those afforded by labeling regulations: "Federal and state laws provide that food manufacturers are required to label products accurately and package products in a non-misleading way. These obligations are <u>independent of one another</u>."  *Izquierdo*, 2016 U.S. Dist. LEXIS 149795, at *15-16 (emphasis added).

Congressional and FDA determinations at the very least constitute powerful persuasive authority that is entitled to substantial deference.   Congress investigated the effect of oversized packaging on consumer perceptions of product volume and found that such packaging can mislead even where net weight/quantity is accurately disclosed on the label.   Defendant has not given the Court any reason to second-guess these conclusions, which have been corroborated by innumerable studies of consumer behavior, including those cited in Amended Complaint ¶ 53. These peer-reviewed scientific studies are entitled to considerably more weight than Defendant's untutored, self-serving, and psychologically unrealistic assumptions that net weight/quantity disclosures correct for the effect of misleading packaging in the minds of reasonable consumers.

Courts have recognized the FDA's authority on this question.  *See In re McCormick & Co*), 215 F. Supp. 3d at 61 ("nonfunctional slack-fill is considered deceptive as a matter of law, so there

is nothing implausible about allegations of actual, widespread deception among McCormick's customers.").   So too has the state of California, whose consumer protection laws expressly incorporate passages from the Federal Registrar providing that accurate disclosures do not cure non-functional slack-fill into its consumer protection laws.   *See* Cal. Bus. & Prof. Code § 12606.2(e).   ("This section shall be interpreted consistently with the comments by the United States Food and Drug Administration on the regulations contained in Section 100.100 of Title 21 of the Code of Federal Regulations, interpreting Section 403(d) of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. Sec. 343(d)), as those comments are reported on pages 64123 to 64137, inclusive, of Volume 58 of the Federal Register.").

Defendant argues that Plaintiff's allegations impute to reasonable consumers a level of ignorance, carelessness, or stupidity that courts do not countenance.   *See* Def. Mem., pg. 21.   This is a caricature of Plaintiff's argument, however.   Plaintiff does not argue that ordinary consumes must be indulged by virtue of their ignorance, carelessness, or stupidity, but that Defendant's disclosures cannot *by their nature* correct the misleading visual impression created by unlawfully slack-filled packaging regardless of the consumer's diligence or intelligence quotient.

A disclosure consisting in a line drawn across the front of packaging indicating the fill level inside might indeed apprise reasonable consumers of how much food they are purchasing because it actually speaks to what they care about, *volume*.   This cannot be said of Defendant's net weight/quantity statements, however.   As *United States v. 174 Cases* observed:

> The question was not whether the ordinary purchaser would expect to find a particular number of individual candies in the box but whether such a purchaser would expect to find more of the Delson box filled. For example, the purchaser of a crate of apples opens the crate and finds it half filled. To determine whether he was deceived we do not ask whether he expected to find a particular number of individual apples in the crate. We do ask whether he expected to find more of the crate filled. This is the pertinent question. People do not think in terms of the number of individual mints when buying them in containers.

*United States v. 174 Cases*, 287 F.2d 246, 247-48 (3d Cir. 1961).

The same holds true of weight.  We do not ask whether a reasonable consumer expected to find that a half-filled crate of apples weighed more than it did, but whether he expected it to be more filled with apples.  And likewise with Defendant's product.  Reasonable consumers have no ready way to translate product weight into volume, and product volume is what they ultimately care about. This is why movie goers will order a small popcorn or a large popcorn, not a "featherweight" popcorn or a "heavyweight" popcorn, and why drinks are advertised in fluid ounces rather than regular ounces.  This thoroughly distinguishes the instant action from a case like *Fermin v. Pfizer*, 215 F. Supp. 3d 209 (E.D.N.Y. 2016), cited by Defendant, which was about *pills*.  Unlike food, pills are not subject to 58 Fed. Reg. 64123, 64128-64129, 64131 and its incorporation into New York state law.  Moreover, consumers care about pill count, not pill volume, because count is what determines how much active ingredient they are obtaining.  By contrast, they care about candy volume, not candy weight or count, because volume is what determines how much satisfaction their palates will be receiving.

These are not the idiosyncratic sentiments of a single plaintiff, but psychological plausible assessments of consumer cognition that many courts have endorsed.  *See Bratton*, 2017 U.S. Dist. LEXIS 74508, at *15-16 ("a reasonable consumer would expect the candy boxes' labeling information to comport with the dimensions of the box"); *In re McCormick & Co.*, 215 F. Supp. 3d at 60.  ("An accurate statement of weight does not necessarily correct a consumer's misimpression of product quantity based on the size of a container, because consumers are accustomed to seeing how much space a product occupies but may not know how that relates to its weight."); *Escobar v. Just Born*, 2017 U.S. Dist. LEXIS 186573, *25 ("In the Court's view, a reasonable consumer is not necessarily aware of a product's weight or volume and how that weight or volume correlates to the product's size. In other words, the fact that the Products' packaging accurately indicated that a consumer would receive 141 grams or 5 ounces of candy does not, on its own, indicate to a

reasonable consumer that the Products' box may not be full of candy and that, instead, 35.7% of the box is empty. Rather, a reasonable consumer may believe that 141 grams or five ounces of candy is equivalent to an amount approximately the size of the Products' box.").

Defendant's reasonable consumer argument relies substantially on *Daniel v. Mondelez*, where the court argued:

> While disclaimers may not always defeat a claim of deception…, the Court draws a distinction between misrepresentations concerning *quantitative* as opposed to *qualitative* characteristics of a product. When the alleged misrepresentation concerns a qualitative quality, consumers are more often forced to weigh various competing statements to tease out the truth — allowing for differing reasonable interpretations. In contrast, when the alleged misrepresentation concerns only the amount or quantity of a product, consumers, once apprised of the express accounting on the label, cannot be said to be misled (so long as the information is presented in a clear, easy to understand manner). Recognizing the existence of slack-fill in almost all products, consumers are especially likely to consider the label, rather than the packaging, to be the accurate measure of the amount of product.

*Daniel v. Mondelez*, 287 F. Supp. 3d 177, 192 n.14 (E.D.N.Y. 2018).

Plaintiff has now explained why she respectfully questions *Daniel*'s reasoning. The operative assumption is that the precision and accuracy of quantitative as opposed to qualitative disclaimers promises to resolve any consumer confusion generated by oversized packaging. But Plaintiff argues that precision and accuracy as such do not guarantee that the information in question will be *meaningful* to a reasonable consumer. Suppose Defendant had succeeded in quantifying the Product's contents down to the molecule, accurately listing the exact number of molecules of each chemical ingredient that a consumer will have consumed by the time he is done with the package. Such information would be precise, accurate, and unambiguous. Yet a reasonable consumer cannot usefully process this information so as to meaningfully assess product quantity and "tease out the truth." This thought experiment is merely an extreme illustration of the points Plaintiff has made regarding quantity and weight disclosures—that quantitative precision is not equivalent to human usefulness. This is exactly why Congress elected to enact prohibitions on non-functional slack-fill to supplement existing labeling regulations requiring weight disclosures, as *Izquierdo* noted.

25

*Daniel* argued that "absent exceptional circumstances, a reasonable consumer acting reasonably would find accurate, clearly visible representations of net weight, serving size, and number of servings to offset any misrepresentations arising from non-functional slack-fill." *Id*. at 192. But the opposite is more nearly true. The norm is that written quantity disclosures cannot offset the impression created by deceptive packaging. Only under exceptional circumstances can they do so. A food scientist who was knowledgeable about snack foods might successfully employ the Product's net weight disclosures in conjunction with its ingredients list to approximate the actual volume of the food inside. But this presupposes specialized scientific expertise that cannot be imputed to the reasonable consumer.

Defendant might dispute Plaintiff's cognitive model with its own alternative model. But this is plainly the kind of disagreement that cannot be resolved on a motion to dismiss as a matter of law and rather needs to be put before a jury informed by both expert testimony and its own experience and common sense. Moreover, it bears noting that Defendant itself actually *agrees* with Plaintiff's psychological assumptions outside the litigation context. Defendant claims that it made the transition from the smaller 3.5 oz box to the larger 3.5 oz box in 2016 simply to accommodate the functionally necessary inner liner. But Defendant announces this transition in its 2016 catalogue by displaying the new box accompanied by the words "NEW LARGER SIZE!." See Lee Decl., **Exhibit E**. This claim did *not* refer to the box's *contents*, however, which remained the same 3.5 oz. Rather, the referent *was the size of the box itself*, which Defendant along with Congress, the FDA, consumer psychologists, common sense, and many courts have recognized exerts an appeal that is independent of the net weight disclosure.

## V.   PLAINTIFF PLAUSIBLY ALLEGES INJURY

As explained already in Amended Complaint ¶¶ 61-62, Plaintiff's allegations of injury are fully consistent with *Daniel*. Recognizing this, Defendant attempts to misdirect the Court with

various expressions of exasperation at Plaintiff's position.  The Court is informed that "Plaintiff's contention is beyond belief," Def. Mem., pg. 22, and that "Plaintiff's contention that the Current Box price is 'inflated' is extraordinary."  Def. Mem., pg. 23.  But real or feigned, Defendant's astonishment is without legal significance, as it never gets around to explaining why *Daniel* should be inapplicable to the instant action.

Citing *Izquierdo*, Defendant argues that Plaintiff was required to demonstrate that she paid a higher price for the Product than she would have "but for the deceptive practice,", and that this higher price flowed from Defendant's decisions, not those of a retailer.  Def. Mem., pg. 23 (quoting *Izquierdo*, 2016 U.S. Dist. LEXIS 149795, at *7).  But as the *Daniel* court recognized, Defendant need not have raised the price for Plaintiff to have been injured:

> In most price premium cases, the alleged misrepresentation conveys to consumers that the product at issue contains a unique, desirable quality… In most cases, "price premium" should thus be observable through an increased price in comparison to products without the desirable quality… Slack-fill cases, however, involve a categorically different type of misrepresentation — *lesser amount or quantity* than represented. Even while holding prices steady, manufacturers can effectively "inflate" the price by providing less product.

*Daniel*, 287 F. Supp. 3d at 195-96.

Defendant harps on the fact that Plaintiff paid $.50 for the Product, but nowhere does it explain how exactly this vitiates the logic of *Daniel*.  Nor does it explain how this logic is undermined by the possibility that the retailer may have had a hand in setting the price.  *Daniel* corresponds perfectly to the theory of injured pleaded in the Amended Complaint:

> Plaintiff and Class members were injured as the result of Defendant's deceptive conduct because they paid money for less Product than Defendant represented they would be receiving. Plaintiff and the Class were deprived of the benefit of their bargain.

> Defendant's Smaller Sixlets box candy demonstrates that a box of Sixlets candy contains **at most** 11% functional slack-fill, and therefore should contain **at least** 89% candy. However Plaintiff GREEN paid $0.50 for a box of the Product and her box was only about 40% full of candy, with slack-fill of about 60%.

Since the Product box was 40% full when it should have been **at least** 89% full, Plaintiff received **at most** 45%[9] of what she bargained for. Accordingly, **at least** 55%[10] of the purchase price, or about $0.28[11] was unlawfully taken.

In order for Plaintiff and Class members to be made whole, they must be compensated in an amount of the proportion of the purchase price equal to the percentage of non-functional slack-fill in the Product, which is equivalent to the amount of product Plaintiff and the Class paid for that Defendant did not-deliver.

Am. Compl. ¶¶ 59-62.

As the *Daniel* Court also observed, this theory of injury "is consistent with *Lazaroff* [*v. Paraco Gas Corp*] which the Second Circuit endorsed as a case illustrative of price premium injury." *Daniel*, 287 F. Supp. 3d 177, 196.  The *Lazaroff* court observed:

Plaintiff alleges that, had he understood the true amount of the product, he would not have purchased it, and that he and the purported members of the class paid a higher price per gallon/pound of propane and failed to receive what was promised and/or the benefit of his bargain, i.e., a full 20 pound cylinder and the amount of propane he was promised. . . Thus, plaintiff has properly alleged injury. Accordingly, the court finds that the plaintiff has stated a claim for a violation of GBL § 349.

*Lazaroff v. Paraco Gas Corp.*, 967 N.Y.S.2d 867, 867 (Sup. Ct.)

Defendant charges that "Plaintiff fails to allege that any price premium flowed from any act of Sweetworks and not Kmart or that SweetWorks benefited from the purported price inflation." Def. Mem., pg. 23.  But *Lazaroff* did not require the plaintiff to plead that it was defendant and not the retailer who set the price of the propane cylinder or benefitted from that price.  While the question of who benefited from Defendant's price premium would be germane to an unjust enrichment claim, it is irrelevant to Plaintiff's actual causes of action.

Nor did *Lazaroff* require the plaintiff to demonstrate that the propane cylinder at issue were more expensive than other comparable products on the market.  The plaintiff was promised a full cylinder of propane but received something less, so he was entitled to the difference between the product's value as warranted and its value as delivered.  This discrepancy was unaffected by the product's comparative expensiveness, and the plaintiff was not required to address it.  Lazaroff

adequately pled injury because, whether or not the defendant set the product's retail price, it most certainly set its fill level.  And it was by virtue of its fill level that plaintiff was deprived of the benefit of his bargain and injured.  Likewise, it was the Defendant that caused the non-functional slack-fill in the Sixlets box and it was the non-functional slack-fill that caused the discrepancy between what Plaintiff was promised and what she actually received.  There is no daylight between *Lazaroff* and the instant action.  Just as Lazaroff failed to receive the full amount of propane he was promised, so Plaintiff here failed to receive the full amount of candy she was promised.

Perhaps Defendant's argument is that Plaintiff has not satisfactorily alleged that the price would have been any lower in the absence of non-functional slack-fill (and hence the deception); for example, had the box been smaller.  But such a requirement does not exist under New York law as delineated by New York's highest court:

> [T]here is a difference between reliance and causation, as illustrated by the facts of this case. Here, plaintiffs allege that because of defendant's deceptive act, they were forced to pay a $ 275 fee that they had been led to believe was not required. In other words, plaintiffs allege that defendant's material deception caused them to suffer a $ 275 loss. This allegation satisfies the causation requirement. Plaintiffs need not additionally allege that they would not otherwise have entered into the transaction. Nothing more is required.

*Stutman v. Chem. Bank*, 95 N.Y.2d 24, 30 (2000).

"Nothing more is required" in the instant action either.  The *Stutman* plaintiffs were <u>not</u> required to show that the bank would only have charged them $100, rather than $275, had it been upfront about the existence of a fee.  For all we know, the bank might still have charged $275 and the plaintiffs might have agreed to pay it.  The *Stutman* plaintiffs bargained for banking services that did not involve a $275 fee but received banking services that did involve a $275 fee.  Their injury was simply the difference in value between what was promised to them and what was actually delivered—$275.  Plaintiff's injury also consists in the difference between what was promised and

what was delivered.  What Defendant might have done in some counterfactual scenario where the deception is neither here nor there.

## VI.   PLAINTIFF HAS PLAUSIBLY ALLEGED COMMON LAW FRAUD

Defendant's argument that Plaintiff fails to plead fraud appears to be a rehash of arguments made in the NY GBL context, disposed of above.  As to intent to deceive, this is attested to by Defendant's promotion of the larger box introduced in 2016 as being a "NEW LARGER SIZE!," discussed above, when it knew that it contained no more candy than the smaller one.

## SUMMARY AND CONCLUSION

All of Defendant's arguments are baseless.  Their weaknesses include (1) frivolous jurisdictional arguments that ask the Court to ignore common sense facts about a company the size of Defendant's, (2) overlooking that consumer fraud class action plaintiffs can seek injunctive relief on behalf of the class, (3) offering specious evidence of slack-fill functionality in an attempt to adjudicate factual issues on a motion to dismiss, and (4) dismissing the definition of injury as delineated by the courts with red herrings about the price and price-setting of the Product.  Given the failure of Defendant's arguments on these and other fronts, Plaintiff respectfully asks the Court to deny Defendant's motion on all counts.

Dated: October 12, 2018

                        Respectfully submitted,

                        */s/ C.K. Lee*
                        By:  C.K. Lee, Esq.

                        **LEE LITIGATION GROUP, PLLC**
                        C.K. Lee (CL 4086)
                        Anne Seelig (AS 3976)
                        30 East 39th Street, Second Floor
                        New York, NY 10016
                        Tel.: 212-465-1188
                        Fax: 212-465-1181
                        *Attorneys for Plaintiff and the Class*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 12, 2018, true and correct copies of Plaintiffs' Memorandum of Law in Opposition to Defendant's Motion for Judgment on the Pleadings were served on all counsel of record via ECF.

*/s/ C.K. Lee*
C.K. Lee, Esq.